UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:12-cr-00119-TWP-DML |
| DEVON ROBINSON -1 ) | |
| KENYA ROBINSON -2 ) | |
| ) | |
| Defendants. ) | |

## ORDER ON MOTION TO SUPPRESS

This matter is before the Court on Defendant Devon Robinson's ("Mr. Robinson") Motion to Suppress (Dkt. 163) and Defendant Kenya Robinson's ("Mrs. Robinson") Motion to Suppress (Dkt. 241). Specifically, Mr. Robinson and Mrs. Robinson seek to suppress any and all evidence and statements allegedly made and obtained following the detention of Mr. Robinson and Mrs. Robinson on June 27, 2012. They also allege their consents to search were involuntarily given. The Court held a hearing on Mr. Robinson's and Mrs. Robinson's motions on January 3, 2013. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its findings of facts and conclusions of law. For the reasons set forth herein, the Motions to Suppress (Dkts. 163, 241) are **DENIED**.

### I. BACKGROUND

On June 27, 2012, a confidential informant ("CI") called Indianapolis State Police ("ISP") Sergeant Dean Wildauer ("Sgt. Wildauer") to report suspicious activity from a group of individuals staying at the Best Western motel located near the intersection of Interstate 465 and East Washington Street in Indianapolis, Indiana. The CI reported that the group had been at the motel for two nights with June 27 being the third night. Each day, Defendant John Bunche (Mr.

Bunche) would pay for the rooms at the front desk. Mr. Bunche had rented the rooms and provided his driver's license to do so. When paying for the rooms, Mr. Bunche used pre-paid credit cards. On June 26, Mr. Bunche attempted to use a pre-paid credit card that was declined. He produced a second pre-paid credit card that was approved, but the CI noticed the name on the second card's account was not "John Bunche." On June 27, 2012 the first pre-paid credit card Mr. Bunche produced was declined. After the credit card machine had trouble reading the second card, Mr. Bunche placed the card in a plastic baggie and swiped it through the machine. The machine read the card, but again, the name on the card's account was not "John Bunche." The CI also reported the group was driving a red mini-van and had traveled from somewhere out east.

      Sgt. Wildauer suspected credit card fraud and called United States Secret Service Special Agent Danny DiRenzo ("Special Agent DiRenzo"). The two made plans to interview the subjects at the Best Western motel the evening of June 27, 2012, and Special Agent DiRenzo would bring his credit card reading machine. Sgt. Wildauer began driving by the Best Western motel and saw a red mini-van that matched the description given by the CI. Throughout the day, Sgt. Wildauer remained in contact with the CI and surveilled the Best Western motel. He also made arrangements to secure other ISP officers to assist that evening. During one call, the CI reported seeing the group in possession of several full shopping bags. Later, the CI reported that more people had joined the group in two SUVs, one black and the other light in color. The CI indicated there were now six or seven African American men and women hanging out in the Best Western motel rooms and parking lot. The group was also going back and forth between the motel and fireworks store, which shared a parking lot with the Best Western motel. Finally, the CI reported to Sgt. Wildauer that the group appeared to be preparing to leave the motel.

Sgt. Wildauer immediately informed Special Agent DiRenzo that the group might be leaving the motel, and Special Agent DiRenzo headed towards the Best Western motel in his vehicle. In the meantime, Sgt. Wildauer arrived on the scene and saw fireworks being shot off in the motel parking lot. A call to the CI confirmed that members of the group were shooting off fireworks. Sgt. Wildauer informed Special Agent DiRenzo of this fact and that he would initiate contact with the group.

Sgt. Wildauer entered the Best Western motel parking lot in an unmarked car at approximately 7:36 p.m. followed by ISP Troopers Chris Townsend and William Etter (collectively, "Troopers"), who were in marked police cars. Sgt. Wildauer drove up to the man shooting off the fireworks, who was later identified as Mr. Bunche, and told him to stop.[1] The Troopers saw a second man standing by a red mini-van, later identified as Defendant Deon Crenshaw ("Mr. Crenshaw"), and asked him to join Sgt. Wildauer, the Troopers, and Mr. Bunche. Sgt. Wildauer also saw three women standing in front of the fireworks store with shopping carts full of fireworks. As he walked toward the women and made eye contact, two of the women abandoned their carts. One went inside the store and the other around the corner of the building. Sgt. Wildauer asked the remaining woman to join the group of Troopers, Mr. Crenshaw, and Mr. Bunche.

As Sgt. Wildauer returned to the group, he surveyed the parking lot. There were only two vehicles other than the red mini-van in the parking lot: a black SUV and a silver SUV. A man, later identified as Mr. Robinson, sat in the silver SUV's driver's seat "staring" intently at the officers, Mr. Crenshaw, and Mr. Bunche. Sgt. Wildauer approached Mr. Robinson and asked him if he was with Mr. Bunche and Mr. Crenshaw. Mr. Robinson stated that he was not. Sgt.

---

[1] Sgt. Wildauer believed shooting off the fireworks was a fire hazard, supported by the fact he had responded one week earlier to a brush fire on Interstate 465 due to the drought-like conditions in Indianapolis at the time.

3

Wildauer asked for Mr. Robinson's keys and placed them on top of the SUV. He then rejoined the group and asked Mr. Bunche and Mr. Crenshaw if Mr. Robinson was part of their group. They responded that he was. Sgt. Wildauer then summoned Mr. Robinson to join the group. The time elapsed from when Sgt. Wildauer entered the parking lot and first approached Mr. Robinson was approximately 5 to 10 minutes.

Sgt. Wildauer entered the fireworks store and witnessed a man, later identified as Defendant Ryan Figueiredo ("Mr. Figueiredo"), paying for a large number of fireworks. One of the women whom he had previously seen outside, was standing next to Mr. Figueiredo. Sgt. Wildauer asked them to join the group outside, and when they returned to the group, the third woman had reappeared. The three women were later identified as Defendants Kenya Robinson, Bianca Galloway ("Ms. Galloway"), and Brandi Baxter ("Ms. Baxter").

The officers began identifying and calling in the seven subjects' information to run warrant and vehicle registration checks (the "checks"). According to evidence proffered at the hearing, dispatch officers received Mr. Robinson's information to run the checks at 7:57 p.m. and Mrs. Robinson's information was received at 7:51 p.m. As the checks were being run, Sgt. Wildauer told the group they were suspected of credit card fraud and asked who had purchased the fireworks. No one admitted to buying or claimed ownership of the fireworks.

Special Agent DiRenzo arrived on the scene between 7:45 p.m. and 7:50 p.m and was briefed by Sgt. Wildauer. The officers questioned the fireworks store owner who confirmed the subjects had purchased almost $3,000.00 worth of fireworks with pre-paid credit cards. Shortly thereafter, the officers began interviewing each member of the group individually. Sgt. Wildauer and Special Agent DiRenzo conducted the questioning while Troopers Etter and Townsend observed the group and occasionally escorted a subject to the restroom.

Mr. Figueiredo was the first to be interviewed. He was read the State Police Advice of Rights Form and Consent to Search Form beginning at 8:05 p.m. He signed the Consent to Search Form at 8:21 p.m. As an oversight, he did not sign the Advice of Rights Form, but orally agreed to speak after being given *Miranda* rights. Mr. Figueiredo stated that he had traveled to Indianapolis with Mr. Robinson, Mrs. Robinson, and Ms. Galloway. He produced two pre-paid visa cards that had been reencoded. Mr. Figueiredo would not reveal who gave him the cards. Ms. Galloway was interviewed next beginning at approximately 8:30 p.m. Ms. Baxter followed at 8:47 p.m., then Mrs. Robinson at 9:01 p.m., Mr. Crenshaw at 9:18 p.m., Mr. Bunche at 9:27 p.m., and finally Mr. Robinson at 9:35 p.m. From the time Sgt. Wildauer arrived until Mr. Figueiredo produced the reencoded credit cards, approximately 29 to 45 minutes had elapsed. Approximately 1 hour and 25 minutes elapsed between when Sgt. Wildauer arrived and Ms. Robinson was questioned. Approximately 2 hours elapsed between when Sgt. Wildauer first approached Mr. Robinson and when Mr. Robinson was questioned.

During both Ms. Galloway's and Ms. Baxter's interviews, officers discovered the women had possession of reencoded pre-paid credit cards. Ms. Galloway stated she traveled to Indianapolis with Mr. Robinson and Mrs. Robinson. Mrs. Robinson signed her Advice of Rights Form at 9:04 p.m. and the Consent to Search Form at 9:08 p.m. She claimed ownership of the black SUV and stated her husband, Mr. Robinson, owned the silver SUV. She possessed four reencoded pre-paid credit cards in her purse, and officers found multiple reencoded pre-paid credit cards in the front dashboard of the black SUV.

At approximately 9:30 p.m., more ISP officers arrived to assist in the searches of the vehicles and motel rooms for the investigation of credit card fraud. Officers then began speaking with Mr. Robinson at 9:35 p.m. He signed the Advice of Rights Form at 9:38 p.m. and the

5

Consent to Search Form at 9:40 p.m. Mr. Robinson claimed ownership of the silver SUV. The initial search of the vehicle discovered multiple iPads and approximately 100 hidden and packaged pre-paid credit cards—several of which were determined to be reencoded. Upon this discovery, the red mini-van and black SUV were searched more thoroughly. These searches uncovered approximately 20 iPads, 15 iPods, two laptop computers, three PlayStation 3s, and other electronic devices. Additionally, officers found 50 pre-paid credit cards, several of which were reencoded. Only Mr. Figueiredo, Ms. Baxter, and Ms. Galloway were re-interviewed. After the searches were complete, all subjects were arrested.

## II. DISCUSSION

### A. Devon Robinson

Mr. Robinson contends the stop of his person was illegal, as he was not committing any criminal offense when approached by Sgt. Wildauer. "Police are permitted, however, to make investigatory stops limited in scope and executed through the least restrictive means reasonable, referred to as *Terry* stops." *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). "A *Terry* investigative stop is a 'brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011). The Court must determine whether Sgt. Wildauer had reasonable suspicion that Mr. Robinson had, was, or was about to commit a crime.

When determining whether a police officer had reasonable suspicion to stop or further detain an individual, "the district court must evaluate the 'totality of the circumstances' to assess whether the determining officer has a 'particularized and objective basis' for suspecting illegal activity." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005). "Reasonable suspicion

is more than a hunch but less than probable cause and considerably less than preponderance of the evidence. It requires some minimal level of objective justification for making a stop given the totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

Prior to his arrival at the Best Western motel, Sgt. Wildauer knew specific and articulable facts that gave rise to a reasonable suspicion of criminal activity by a group of six or seven African American men and women driving a red mini-van, black SUV, and light colored SUV. These facts included that a member of the group had attempted to, and paid for, motel rooms with pre-paid credit cards; members of the group were seen with multiple retail bags; and members of the group were going back and forth between the fireworks store and motel. When Sgt. Wildauer arrived, he observed only three vehicles in the Best Western motel parking lot: a red mini-van, a black SUV, and a silver SUV. Mr. Robinson was sitting alone inside the silver SUV. When Mr. Robinson was initially approached, he denied being with Mr. Crenshaw and Mr. Bunche. However, Mr. Crenshaw and Mr. Bunche told Sgt. Wildauer that Mr. Robinson was with them. The men also told officers conflicting information about why they came to Indianapolis. The totality of the circumstances establishes that Sgt. Wildauer, based on his training and experience, had reasonable suspicion that a group of African American men and women were engaging in credit card fraud, including Mr. Robinson who was observing the group's activities while sitting in a vehicle that matched the description given by the CI and who was associated with Mr. Crenshaw and Mr. Bunche. *See United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003) (finding in a credit card fraud case, it was reasonable for police officers to rely on information received from a store manager and personal observations to draw an inference that defendants were involved in credit card fraud; "The two men not only were in the right place at

7

the right time but also fit the suspects' descriptions.  This collocation of circumstances plainly satisfied the reasonable suspicion standard for an initial *Terry* stop.").

In evaluating the reasonableness of an investigatory *Terry* stop, a court must first examine whether the officer's action was justified at its inception; the court must then determine whether it was reasonably related in scope to the circumstances which justified the interference in the first place.  *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *see Jewett*, 521 F.3d at 823.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. . . ."  *Florida v. Royer*, 460 U.S. 591, 500 (1983) (plurality opinion).  There is no rigid time limitation on *Terry* stops, and courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Sharp*, 470 U.S. 675, 685 (1985); *Bullock*, 632 F.3d at 1015.  Having found that the *Terry* stop of Mr. Robinson was justified at its inception, the court next must determine whether the scope was reasonable.

Sgt. Wildauer arrived at the Best Western motel at 7:36 p.m.  He made contact with Mr. Robinson approximately 5 to 10 minutes later.  In the time that followed, Sgt. Wildauer and the Troopers questioned the group and informed them they were suspected of credit card fraud.  Identifying information from driver's licenses of seven individuals and vehicle registrations of three vehicles, were called in to dispatch for warrant and title checks.  Dispatch began receiving pages of Mr. Robinson's criminal history at 7:58 p.m. until 8:23 p.m.[2]  When Special Agent DiRenzo arrived, he and Sgt. Wildauer questioned the fireworks store owner and learned that members of the group had purchased fireworks with pre-paid credit cards.  The officers also

---

[2] The Government made a proffer, without objection, of this information at the hearing.  It is unknown when the officers received the information from dispatch, but no warrants returned on any of the subjects.

searched the trash cans for cards the group may have thrown away. At 8:05 p.m., approximately 29 minutes after Sgt. Wildauer arrived, Mr. Figueiredo's interview began. Mr. Figueiredo signed his Consent to Search Form at 8:21 p.m, approximately 45 minutes after Sgt. Wildauer's arrival. Up until and during Mr. Figueiredo's interview, the officers diligently investigated their suspicions.[3] Moreover, the officers made no show of force and the degree of intrusion was minimal.

Mr. Robinson additionally argues that he was detained for 2 hours and the investigatory stop became a *de facto* arrest that was unsupported by probable cause. The Government argues that probable cause was established sometime around 8:21 p.m. during Mr. Figueiredo's interview. During Mr. Figueiredo's interview, Sgt. Wildauer and Special Agent DiRenzo found reencoded credit cards, which are evidence of credit card fraud, and Mr. Figueiredo stated he traveled to Indianapolis in the SUVs with Mr. Robinson and Mrs. Robinson.

Courts in other circuits have held on similar facts that the discovery of fraudulent credit cards establishes probable cause for an arrest for credit card fraud. In *United States v. Smith*, No. S1-4:07CR00313 RWS (AGF), 2007 WL 2409755 (E.D. Mo. Aug. 20, 2007), Target store employees reported to police that a woman had attempted to purchase gift cards with several credit cards used in rapid succession. *Id.* at *1. Further, Target reported at least one other woman was involved and that the subjects were driving a silver Hummer. When police arrived, they approached three women in a silver Hummer. After the women consented to a search, police found a credit card skimmer and four reencoded credit cards. *Id.* at *2–3. The court found that the report from Target established reasonable suspicion for a *Terry* stop. *Id.* at *6. It also found that the officers had probable cause to arrest the subjects given the totality of the

---

[3] Mr. Robinson argued that because the subjects were interviewed one at a time the stop was unreasonably lengthened. However, the Court finds that given the totality of the circumstances the investigation was diligent and reasonably tailored.

circumstances: a reliable report from Target, confirmation that the subjects possessed reencoded credit cards, the discovery of an illicit credit card reader, and that the Hummer was full of various purchases from other stores. *Id.* at *11. Similarly, in *Lee*, the First Circuit found that when defendant's companion was found in possession of fraudulent credit cards—taken with the totality of the circumstances including a report that two men attempted credit card fraud, the police discovered defendant in the vicinity of the attempted fraud, the van he was driving contained a large quantity of expensive and newly acquired merchandise—was enough to establish probable cause for his arrest. *Lee*, 317 F.3d at 32. The court stated, "To cinch matters, the two men were not merely near one another but were traveling companions who satisfied the store manager's descriptions and who—by the [defendant's] own prearrest admission—jointly possessed the newly acquired merchandise." *Id.* at 32–33.

The Court finds this authority persuasive. Once reencoded credit cards were found on Mr. Figuerado and given the circumstances outlined above, probable cause to arrest the subjects—including Mr. Robinson—was established. "Probable cause to arrest requires an arresting officer to possess knowledge from reasonably trustworthy information that would lead a prudent person to believe that a suspect has committed a crime." *United States v. McCauley*, 659 F.3d 645, 649 (7th Cir. 2011) (internal quotation marks omitted). This is not a case where police had only a "bare-bones description and a location." *Id.* Officers had not only a description of the group and their vehicles as well as their immediate proximity to the location reported, but also inconsistent statements by subjects, statements that connected the group together, and actual fraudulent credit cards. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." *Id.* (quoting *Hill v. California*,

10

401 U.S. 797, 804 (1971)).  Therefore, the Court finds that the initial *Terry* stop of Mr. Robinson was reasonable and his continued detention was supported by probable cause.

Alternatively, Mr. Robinson argues that his Consent to Search was not freely and voluntarily given.  Specifically, he argues that his detention served to coerce his consent by the threatening presence of officers.  Looking at the totality of the circumstances, the record does not support Mr. Robinson's argument.  The officers at the scene did not threaten or make any sign of force toward the detained subjects.  The subjects were allowed to keep their cell phones and were allowed some freedom of movement.  Further, Sgt. Wildauer testified that Mr. Robinson was not repeatedly asked to consent and freely agreed to sign the Consent to Search Form, and there is no evidence before the Court which disputes Sgt. Wildauer's testimony.  Therefore, the Court finds Mr. Robinson's Consent to Search was voluntary.

**B.   Mrs. Robinson**

Mrs. Robinson contends she was unconstitutionally seized without reasonable suspicion.  Therefore, she argues, all evidence seized from her must be suppressed.  Mrs. Robinson was first approached just a few minutes after Sgt. Wildauer arrived at the Best Western motel.  She was standing outside the fireworks store with two other women next to shopping carts full of fireworks.  She was asked to join the Troopers, Mr. Crenshaw, and Mr. Bunche in the parking lot.  Based on the totality of the facts known to officers at that time and outlined above, there was reasonable suspicion to stop Mrs. Robinson.  Further, as discussed above, the officers diligently continued their investigation during the stop.  Sgt. Wildauer and Special Agent DiRenzo interviewed the fireworks store owner and confirmed that the subjects had purchased large quantities of fireworks with pre-paid credit cards, searched the trash cans outside of the fireworks store, and sent information into dispatch for warrant and vehicle checks.  Then, during

11

Mr. Figueiredo's interview, he stated he had traveled to Indianapolis with Mrs. Robinson in her SUV and officers found reencoded credit cards. As explained above, this established probable cause that the group was engaged in credit card fraud. Therefore, the Court finds that the initial *Terry* stop of Mrs. Robinson was reasonable and her continued detention was supported by probable cause.

Additionally, the evidence before the Court is that Mrs. Robinson was read the Consent to Search Form and she freely and voluntarily, without any coercion whatsoever, signed the form. Thus, the Court finds the evidence obtained against Mrs. Robinson was not done in violation of her Fourth and Fifth Amendment rights.

### III. CONCLUSION

For these reasons, Defendant Devon Robinson's Motion to Suppress (Dkt. 163) and Defendant Kenya Robinson's Motion to Suppress (Dkt. 241) are **DENIED.**

SO ORDERED.

Date: 01/14/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth Lawrence Riggins
kennethriggins@yahoo.com

Kathleen M. Sweeney
SCHEMBS SWEENEY LAW
ksween@gmail.com

Bradley Paul Shepard
UNITED STATES ATTORNEY'S OFFICE
brad.shepard@usdoj.gov